UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at WINCHESTER

PATRICIA GUESS,                    )
                                   )
        *Plaintiff,*               )          No. 4:05-cv-40
                                   )
v.                                 )          Judge Mattice
                                   )
GRANGE MUTUAL CASUALTY             )
COMPANY,                           )
                                   )
        *Defendant.*               )

## <u>MEMORANDUM OPINION</u>

This is a lawsuit by the insured Plaintiff against her homeowner's insurance company for a fire loss to her former residence located at 151 Willow Drive in Winchester, Tennessee on or about June 9, 2004. The sole defense asserted by Defendant is arson; that is, the Defendant contends that Plaintiff intentionally set or caused the fire which resulted in the damage to her residence, and that such damage is therefore excluded from coverage by the terms of the subject policy.

## I.    PROCEDURAL BACKGROUND AND JURISDICTION

This action was originally filed in the Chancery Court of Franklin County, Tennessee, No. 18004. It was removed to this Court by the Defendant, Grange Mutual Casualty Company pursuant to 28 U.S.C. §§ 1441 and 1446, on the basis of diversity jurisdiction pursuant to 28 U.S.C. § 1332. [Court Doc. No. 1, Notice of Removal]. The Court's jurisdiction is not in dispute.

1

## II.    STIPULATED FACTS AND TRIAL TESTIMONY

This matter proceeded to a bench trial before the undersigned in Winchester, Tennessee on January 30, 2007.  At the trial, the following facts were either stipulated by the parties or testified to by the witnesses called.

At all times relevant hereto the Plaintiff, Patricia Guess, has been a resident of Franklin County, Tennessee.  The insurance policy under which Ms. Guess seeks recovery was issued by the Defendant Grange Mutual Casualty Company under Policy No. SH 6329191-00.  The relevant effective dates were from August 15, 2003 to August 15, 2004 at 12:01 A.M.  The parties have stipulated that the policy was in force on the date of the subject loss.  The policy limits were as follows: $158,000.00 as to the dwelling; $15,800.00 as to other structures; $110,600.00 as to personal property; and $31,600.00 as to loss of use.  The parties have stipulated that Plaintiff's total actual damages resulting from the fire loss are $184,085.69, broken down as follows: personal property, $17,185.69; trees and shrubs, $7,900.00; debris removal from swimming pool, $1,000.00; dwelling, $158,000.00 [Court Doc. No. 29, Trial Stipulation as to Damages].  There is no dispute between the parties that the subject fire losses were covered under the terms of the policy or that Plaintiff has satisfied all contractual conditions precedent to recovery.  Rather, and as stated above, the sole dispute is whether the subject fire was caused by Plaintiff's arson.

Because, as explained below, the Defendant bears the burden of proof with respect to the affirmative defense of arson, Plaintiff Guess waived her option to present a case-in-chief.  In its case-in-chief on the affirmative defense of arson, Defendant Grange Mutual called the following witnesses: the Plaintiff; Brent Cates of the Broadview Volunteer Fire

2

Department; Terry Lee Hasselbring, a former neighbor of the Plaintiff; and James K. Gardner, who was qualified as an expert on the cause and origin of fires. In her rebuttal case, Plaintiff Guess called Beverly Gibbs, a former neighbor; Diana Spellman, the daughter of the Plaintiff; and recalled herself.

The parties are in agreement that in Tennessee, in order to prevail on the affirmative defense of arson, a defendant insurer must prove, by a preponderance of the evidence, three things: (1) that the loss was due to a fire of incendiary origin, (2) that the insured had an opportunity to set the fire, and (3) the insured had a motive to do so. *See, e.g., McReynolds v. Cherokee Insurance Co.*, 815 S.W. 2d 208, 211 (Tenn. Ct. App. 1991). Accordingly, the Court will review the evidence with an eye toward these three factors.

With respect to whether the subject fire was of an incendiary origin, the principal witnesses were Brent Cates and James Gardner. Mr. Cates, the Captain of the Broadview Volunteer Fire Department, has 11 years experience as a firefighter and was the ranking firefighter on the scene on the night in question. He testified that the initial report of the subject fire was received at 8:42 p.m. and the first firefighters arrived on the scene at 8:53 p.m. By the time they arrived, the fire was rather large, and the firefighters gained access to the interior of the house by forcing open the garage door. Mr Cates testified that in the process of attempting to find a way to enter the house, he inspected all accessible entrances, and found no indication of any previous forced entry.

Mr. Cates stated that it took the firefighters approximately 30 to 40 minutes to get the original fire under control and another approximately two and one-half hours to extinguish it. As the ranking firefighter on the scene, it was Mr. Cates' responsibility to declare the fire extinguished, and he did so as to the original fire at approximately midnight.

3

About one hour later, at approximately 12:59 a.m., the fire department received another call for a fire at the same address, 151 Willow Drive, and Mr. Cates, along with the other firefighters, responded.  Mr. Cates stated that upon their arrival, the firefighters found three more large fires burning, all at locations different from that of the original fire.  Mr. Cates testified that based on his experience, it was highly unusual for rekindlings to occur so soon following the extinguishment of the original fire, and at distinctly different locations from the original fire.  Mr. Cates further testified that later that night and again the next morning, even after extinguishing the three additional fires, the fire department was recalled to the scene two more times, to extinguish additional rekindlings.  Mr. Cates testified that based on his observations and experience, he was suspicious whether the fires found on the second call were the result of rekindlings of the original fire.  He also testified, however, that  the fires found on the subsequent calls were more typical of rekindlings.

On cross-examination, Mr. Cates testified that on the night in question, the Plaintiff, Ms. Guess, was not at the scene when he arrived, but that she arrived sometime later.  He also testified that while he didn't recall seeing Mr. Terry Hasselbring on the scene when he arrived, he was aware that Mr. Hasselbring lived across the street from the fire scene, and that he was home when Mr. Cates left at midnight.  Mr. Cates had no idea who might have been at the scene of the fire between the time he left at midnight and returned at 1:00 a.m.  Although the fires he observed upon his return seemed unusual and suspicious, Mr. Cates observed no external indications that the fires had been intentionally set.  Mr. Cates also

testified that when he had seen Ms. Guess at the scene of the fire on the night in question, she had appeared to be visibly upset.[1]

On cross-examination and again on re-direct, Mr. Cates testified that he is not an expert on the cause and origin of fires and therefore had no opinion on how the subject fire started, and no basis for suspecting Ms. Guess of starting it. Also on re-direct, Mr. Cates stated that as far as he knew, Ms. Guess and Mr. Hasselbring seemed to be good friends and that, in his experience, it is not unusual for neighbors to watch a fire being extinguished, as had Mr. Hasselbring on the night in question.

Mr. Gardner, Grange Mutual's cause and origin expert, conducted an on-scene examination of the damaged premises on June 11, 2004. Based on a number of observations made and responses to inquiries received during the course of his fire scene investigation, Mr. Gardner concluded that the fire originated in the center portion of the right side of the basement of the house and that its ignition was the result of an externally applied heat source, the precise nature of which was unknown.

In his trial testimony, Mr. Gardner seemed to place significant emphasis on the peculiar nature of the re-kindlings of the original fire, which had apparently resulted in more extensive damage to the structure than had the original fire. Mr. Gardner testified that it was extremely unusual for a rekindling of a fire to occur within as short a time as one hour after the original fire was extinguished, as had the first of the three rekindlings in this case, and it was also extremely unusual for the rekindlings to occur in three different locations on the overall scene, as had these rekindlings, rather than at the initial point of origin.

---

[1] In their testimony in Plaintiff's rebuttal case, both Beverly Gibbs and Diana Spellman confirmed Mr. Cates' description of Ms. Guess's apparent emotional state on the night of the fire.

On cross-examination, Mr. Gardner conceded that he had not placed as much emphasis on the rekindlings in his written report as he did in his testimony. He testified, however, that even though he did not arrive at the scene until two days after the fire, he was able to distinguish between the damage which had been done by the original fire and that which resulted from the rekindlings.

Mr. Gardner also conceded on cross-examination that his investigation did not include testing designed to determine whether there was residue of a chemical accelerant at the scene which might indicate the such accelerant had been used to start the fire. He testified, however, that the "spalding" of the concrete floor in the basement, as well as the sheen on the water which was left on the floor following the extinguishment of the fire, suggested that a chemical accelerant could have been used. Mr. Gardner also stated on cross-examination that his conclusion as to the incendiary origin of the fire was reached largely through a process of elimination of other possible explanations for the fire, but defended his methodology as a reliable means of determining the origin of fires. On re-direct examination, Mr. Gardner expanded on this defense of his "process-of-elimination" methodology, explaining that fires of this type do not occur by spontaneous combustion.

With respect to the issue of whether the insured, Ms. Guess, had an opportunity to start the fire in question, she testified that upon her divorce from Leonard Caso, which became final on March 2, 2004, she acquired sole title to the house at 151 Willow Drive in Winchester, Tennessee. In accordance with the divorce decree, Ms. Guess was obliged to sell that house and apply the proceeds, in part, to liquidate indebtedness on another residence to which Mr. Caso acquired title as part of the divorce decree.

Accordingly, sometime shortly before the fire on June 9, 2004, Ms. Guess had begun moving into a townhouse owned by her aunt, Diana McIntosh, which she intended to purchase from her aunt, and where it was her intention to reside permanently. While she testified that at the time of the fire she was still living at 151 Willow Drive, within the week and days immediately preceding the fire, Ms. Guess had moved many of her belongings, including several large and expensive items, including a bedroom suite, into the townhouse. When she was cross-examined, Beverly Gibbs stated that she had helped Ms. Guess move some items out of the house the day before the fire. On the date of the fire, Ms. Guess had working telephones connected at both 151 Willow Drive and the townhouse, and had family pictures and other personal items located at the townhouse.

Ms. Guess testified that the last time she was in the house at 151 Willow Drive was at approximately 4:30 a.m. on the morning of June 9, 2004. She had slept in the house the night before and left for her job as a dietician at Southern Tennessee Medical Center at that time. When she got off work at approximately 12:30 p.m. on June 9, she did not go back to the Willow Drive residence, but instead went to the townhouse, because she was tired. Although Ms. Guess testified that it was her intention to return to the Willow Drive house to sleep the night of the fire, before she could do so, at approximately 8:30 p.m. she received a telephone call from Karen Hasselbring, her next-door neighbor on Willow Drive, telling her that her house was on fire. She immediately left the townhouse for Willow Drive, which was about 15 minutes away. Upon her arrival, she observed her house burning and sat with the Hasselbrings on their front porch as they watched the firefighters put out the fire.

Ms. Guess testified that on the day following the fire, she had talked at the scene with Robert Campbell, an official from the Franklin County Sheriff's Department who investigated the fire. Mr. Campbell told Ms. Guess that the fire appeared to him to be the result of arson. In the course of that conversation Mr. Campbell asked Ms. Guess if she knew of anyone who might want to burn her house. Although Ms. Guess responded that she did not, she mentioned to Mr. Campbell that during the period when she and Mr. Caso had been separated and in the process of getting a divorce, he had made threats regarding the Willow Drive house, stating at one point, that "no one would ever live in that house." At another point in her testimony, Ms. Guess testified that her relationship with Mr. Caso during this period could be characterized as "bitter." Ms. Guess also testified that although she had changed the locks following the divorce, it was possible that Mr. Caso may have had a means of access to the interior of the Willow Drive residence. She did not, however, know where Mr. Caso or his son were on the night in question. At another point in her trial testimony, Ms. Guess conceded that due to her obligation to retire the outstanding debt on his residence, Mr. Caso would have benefitted from the sale of the Willow Drive residence.

During her sworn statement to the insurance company which she gave on October 11, 2004, Ms. Guess also identified Mr. Terry Hasselbring, her next door neighbor, as having an incentive to burn her house. According to Ms. Guess, Mr. Hasselbring may have had a motive to burn her house because he was angry at her over a dispute involving a $1,000.00 gambling debt that Ms. Guess allegedly owed to him. During her trial testimony, Ms. Guess observed that Mr. Hasselbring would have had easy access to her house during the period between midnight and 1:00 a.m. when the first

8

rekindles occurred, since he lived next door. She, on the other hand, testified that she had returned to her townhouse and gone to bed during this period of time. In his testimony, Mr. Hasselbring denied burning Ms. Guess's house out of revenge or for any other motivation.

As to the issue of Ms. Guess's motive to burn her house, Defendant Grange Mutual presented a number of financial documents which were introduced and explained through the testimony of Ms. Guess. Included among these documents were the 2002 federal income tax return filed jointly by Ms. Guess and her former husband; the 2003 federal income tax return filed separately by Ms. Guess; records from Ms. Guess's account at the AEDC Federal Credit Union; records from Ms. Guess's account at Citizen's Community Bank; and the Final Decree of Divorce between Ms. Guess and her former husband, Mr. Caso, entered by the Circuit Court for Tennessee's Twelfth Judicial District, sitting at Winchester.

As shown by those documents and Ms. Guess's testimony, shortly following her divorce from Mr. Caso, and as a result of the combined effect of her loss of the benefit of pension payments which Mr. Caso had been receiving and which had been used, in part, to defray the couple's living expenses,  as well as the additional financial obligations which were imposed on Ms. Guess by the divorce decree, Ms. Guess began experiencing increased financial pressures. These pressures served to exacerbate financial difficulties which Ms. Guess had already begun facing as a result of the loss of rental income from a former tenant of a garage owned by Ms. Guess.  By her own admission, at the time of the fire, Ms. Guess was "struggling to pay bills."

Ms. Guess testified that as early as two years prior to their divorce, she and Mr. Caso had put the 151 Willow Drive house on the market for sale. The asking price was

originally $350,000.00, but was later reduced to as low as $289,000.00. Ms. Guess stated that one month before the fire, she had received an offer to purchase the house for $250,000.00, but had declined the offer because she needed at least $285,000.00 to "break even" with respect to her financial obligations. Had she received that amount, it was her plan to purchase the townhouse from her aunt, Ms. McIntosh, for $220,000.00.

Ms. Guess further testified that because the 151 Willow Drive house was situated on lakefront property, the underlying real estate was itself quite valuable. Accordingly, in July, 2004, one month after the fire destroyed the house, Ms. Guess was able to sell the property to a third party for $145,000.00, which she in turn paid to her aunt as a partial payment on the townhouse. Ultimately, however, and due to a dispute between Ms. Guess and her aunt on an unrelated matter, Ms. Guess abandoned her plan to purchase the townhouse and moved out. The aunt, however, refunded only $109,000.00 to Ms. Guess, retaining the balance of the $145,000.00 as repayment for a loan which the aunt had previously advanced to Ms. Guess to help her pay for a lawyer in her divorce proceedings.

In her direct testimony, Ms. Guess stated that approximately four or five years earlier, her next door neighbors, Terry and Karen Hasselbring, invited her to accompany them on a gambling trip to Las Vegas. When Ms. Guess responded that she did not have the money to go, Mr. Hasselbring gave Ms. Guess $1,000.00 so she could go on the trip. Sometime later, however, a dispute arose between Ms. Guess and Mr. Hasselbring over whether the money had been a loan or a gift.

Ms. Guess also testified that because Mr. Caso had paid all the couple's bills, including insurance, Ms. Guess had assumed, prior to the fire, that the 151 Willow Drive house had been insured for the full replacement value, more than ultimately turned out to

be the case. Under cross-examination, Ms. Guess testified that at the time of the fire there was no mortgage or other lien attaching to the 151 Willow Drive residence, other than the obligation imposed by the divorce decree, to use proceeds of the sale to liquidate an approximately $11,000.00 indebtedness on her ex-husband's house.

In his direct testimony, Terry Hasselbring stated that sometime shortly before the subject fire, Ms. Guess had approached him as they were in their respective yards on Willow Drive and, without warning or context, asked Mr. Hasselbring "Are you going to back me up, man? I'm going to burn my house." Mr. Hasselbring replied, "Do what? Absolutely not."

Mr. Hasselbring also testified that as Ms. Guess sat with he and his wife on their porch on the night of the fire, she told them that the insurance adjuster would come to the scene the next morning, and that nobody should say anything to the adjuster until she arrived. Mr. Hasselbring also testified that Ms. Guess instructed them that should the insurance adjuster ask them, they should say that Ms. Guess had been living at her Willow Drive residence, even though Ms. Guess had not actually lived at the Willow Drive residence for ten to 14 days prior to the date of the fire. Mr. Hasselbring also testified that as they watched the house burn, Ms. Guess had commented, "I wish they'd just let it burn," but that under similar circumstances, he would have probably said the same thing.

Mr. Hasselbring acknowledged that he and Ms. Guess had been previously engaged in a dispute regarding her repayment of what he characterized as a $1,000.00 loan to Ms. Guess in connection with the gambling trip, four or five years ago, to Las Vegas. He testified that Ms. Guess had not repaid him until approximately two months prior to the trial of this matter, after Mr. Hasselbring had been disclosed as a trial witness.

On cross-examination, Mr. Hasselbring testified that Ms. Guess made the statement about her intention to burn her house sometime in May of 2004, the month before the fire. He also specified that the conversation took place as he was at his mailbox retrieving his mail and as Ms. Guess was driving out of her adjacent driveway. On cross-examination, Mr. Hasselbring testified that Ms. Guess had asked him "Do you know of anybody that could help me get my house burned?". Mr. Hasselbring estimated that prior to the trial, in addition to the investigator and the attorney for defendant Grange Mutual, he had told three or four people about Ms. Guess's statement to him. He acknowledged, however, that he had not told the insurance investigator or the official investigator from the Franklin County Sheriff's Department about her statement when he talked to them the day after the fire. Mr. Hasselbring also testified that he was aware that Ms. Guess had told "hundreds" of people in the community that she suspected him of setting fire to her house.

Both when she was cross-examined and again in her rebuttal testimony, Ms. Guess denied making any statement to Mr. Hasselbring evincing an intention to have her house burned. In her rebuttal testimony, Ms. Guess stated that Mr. Hasselbring had never said anything to her directly about making such a statement, and suggested that his trial testimony may have been motivated by his animosity towards her relating to the disputed gambling debt. She also denied that her recent repayment of those monies to Mr. Hasselbring had been an attempt to influence his trial testimony.

Ms. Guess testified that she had nothing to do with the burning of her house and that she had nothing to gain by the fire. When cross-examined, however, Ms. Guess conceded that, assuming Grange Mutual had paid her for the entire amount of her claim, those monies, when combined with the $145,000.00 she received for her lakefront lot in

July, 2004, would have exceeded what she would have realized had she sold the house and lot for $289,000.00, her final asking price.

## III.    APPLICABLE LAW

Because this action is properly before the Court on the basis of diversity jurisdiction, the Court is obliged to apply the substantive law of Tennessee. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). As noted above, because the only issue before the Court is the affirmative defense of arson by the insured Plaintiff, the burden is on the Defendant, Grange Mutual, to prove by a preponderance of the evidence, *see, e.g., Hendrix v. Insurance Co. Of North America,* 675 S.W. 2d 476 (Tenn. Ct. App. 1984),  the following three elements: (1) that the loss was due to a fire of incendiary origin, (2) that the insured had an opportunity to set the fire, and (3) the insured had a motive to do so. *See, e.g., McReynolds v. Cherokee Insurance Co.,* 815 S.W. 2d 208, 211 (Tenn. Ct. App. 1991). The burden may be met  through the introduction of either direct or circumstantial evidence. *See, e.g., Huff v. State Farm Fire & Casualty Ins. Co.,* 716 S.W. 2d 927, 928 (Tenn. Ct. App. 1986) ("[c]ircumstantial evidence is competent to prove arson 'if the inferences are not too remote and all circumstances, including the inferences, are of sufficient force to bring minds of ordinary intelligence to a persuasion of incendiarism by a fair preponderance of the evidence.' ") (citing J. Appleman, *Insurance Law and Practice* § 12682 (1980). In order to prevail on a defense of arson, however, the insurer must carry its burden with respect to all three elements. Regardless of the strength of the proof on the other elements, the defense fails if the proof does not satisfy the burden as to any  single

element. *Walters v. Tennessee Farmers Mutual Ins. Co.,* 873 S.W. 2d 691 (Tenn. Ct. App. 1993).

## IV.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    <u>The Incendiary Origin of the Fire</u>

Although at trial Plaintiff's counsel cross-examined Defendant's cause and origin expert, Mr. Gardner, aggressively regarding the reliability of his "process-of-elimination" methodology, and particularly regarding his failure to incorporate any chemical testing into his investigative technique, in her post-trial brief [Court Doc. No. 30], Ms. Guess places most of her emphasis on what she contends was Mr. Gardner's failure to establish an incendiary origin for the re-kindles which, she contends, were what actually destroyed the house.

In response, and while continuing to defend the methodology employed by Mr. Gardner to reach his opinion that the fire was intentionally set, Grange Mutual points out that the conclusion that both the original fire and at least the initial three rekindlings were more likely than not intentionally set is supported not only by Mr. Gardner's testimony, but also by the testimony of Brent Cates, who was the ranking firefighter on the scene. As noted above, Mr. Cates, while acknowledging that he is not a cause and origin expert, did testify that he had 11 years experience as a firefighter. He also testified that based on his experience, he found it unusual and suspicious for the initial rekindlings to have erupted so soon (approximately one hour) following the extinguishment of the original fire, and at three different places from the original fire. Although he did not say so explicitly, Grange Mutual argues, and the Court agrees, that the clear import of Mr. Cates' testimony was that

the unusual and suspicious character of the initial three rekindlings suggested to him that the fires were intentionally set.

The Court found both Mr. Gardner and Mr. Cates to be credible witnesses. While the Court would observe that had the sole basis for Mr. Gardner's expert opinion that the fire was of an incendiary nature been the likelihood of the presence of an accelerant, it is not clear that Grange Mutual could have sustained its burden of proof on this element. That was not the basis for Mr. Gardner's opinion, however. Rather, the basis for Mr. Gardner's opinion was his "process-of-elimination" methodology and analysis, and his observation that fires of this sort do not start through a process of spontaneous combustion. Viewed as a whole, the Court finds Mr. Gardner's methodology sound, and his conclusion reliable.

The Court also found Mr. Cates' observations, based on his 11 years experience as a firefighter, to be pertinent and persuasive. Unlike Mr. Gardner who, as is the case with any retained expert witness, could have a bias, albeit perhaps unconscious, in favor of his client, it is not apparent to the Court that Mr. Cates had anything to gain or lose by testifying as he did. At a minimum, Mr. Cates' testimony regarding his observations about the unusual and suspicious nature of the initial three rekindles serves to bolster Mr. Gardner's opinion that it is more likely than not that both the original fire and the initial rekindles were of an incendiary nature. Accordingly, the Court concludes that Defendant Grange Mutual has carried its burden of proof as to this element of its affirmative defense of arson.

### B.  Ms. Guess's Opportunity to Set the Fire

As the Defendant points out, in order to carry its burden of proof on this element, it is not necessary for Grange Mutual to show that Ms. Guess herself was actually on the

scene and struck the match. *See, e.g., Gregory's Continental Coiffures & Boutique, Inc.*

*v. St. Paul's Fire & Marine Ins. Co.*, 536 F.2d 1187, 1191 (7th Cir. 1976),  Rather, Grange

Mutual may carry its burden by demonstrating that there is credible evidence to support a

reasonable inference that Ms. Guess procured someone else to burn her house. *Id.*; *Arms*

*v. State Farm Fire & Cas. Co.,* 731 F.2d 1245, 1250 (6th Cir. 1984).   Nor is it necessary

for Grange Mutual to particularly identify that "someone else." *Id.*  In the case at bar, and

as pointed out by Ms. Guess in her post trial brief, Grange Mutual does not seem to

seriously suggest that Ms. Guess herself set the subject fire; in fact, that hypothesis would

seem to be inconsistent with the proof in the case. Rather, it is almost certainly

Defendant's theory that Ms. Guess procured some unidentified person or persons to burn

her house.

Perhaps due to the large variety of fact patterns which  present themselves in arson

cases, and the manner in which the leading court opinions address those  facts as applied

to the overlapping factors to be considered in establishing an arson defense, in their briefs,

the parties have sometimes conflated their discussions of this element and the motive

element, which will be discussed below.

As the Court views it, this is the most clear-cut aspect of the case.  Ms. Guess

asserts an alibi only as  to her own physical presence at the scene.  The evidence is

undisputed that at the time the subject fire occurred, Ms. Guess was necessarily in the

process of attempting to dispose of the house through sale, and that in pursuance of those

plans she had located another place to live and had even begun moving her personal

effects out of the Willow Drive residence and into her aunt's townhouse. Although she was

not physically in the house at the time the fire began, she had constant access to it, had

recently had a new set of keys made, had very recently been in and out of the house on a regular basis, had precise knowledge of all points of access and egress and of the contents of the house. In addition, and although it is undisputed that Ms. Guess returned to her aunt's townhouse between the extinguishment of the fire at midnight and the initial three rekindlings at 1:00 a.m., it is also undisputed that the townhouse was only 15 minutes away, that she was a longtime member of the community and knew many other people in it, that she had observed the extent of the damage done to the house by the original fire, and that she had a connected and presumably working telephone at the townhouse.

Given this set of circumstances, and even putting aside the other evidence in the case such as her alleged comments to Mr. Hasselbring, which will be discussed below in connection with the motive element, the Court finds that there is no doubt that Ms. Guess did, in fact, have the opportunity to cause her house to be burned. Accordingly, the Court concludes that the Defendant has carried its burden of proof as to this element.

### C.  Ms. Guess's Motive to Set the Fire

The Court views this as the most problematic of the elements in the case. As Plaintiff points out, a common fact pattern in many arson cases - a large unpaid mortgage on the subject property and an even larger insurance policy  which would more than cover the indebtedness and provide the insured with extra cash - is not present here. Any financial incentive which Ms. Guess may have had to burn her house is much more subtle, if it existed at all. Grange Mutual has gone to great lengths to posit a plausible hypothesis for financial calculations in which Ms. Guess may have engaged in order to permit her to reach a conclusion that it was in her financial best interest to see her house burn. Ms. Guess, of course, seeks to have the Court view that hypothesis as the product of an over-

active imagination and the desire not to have to pay on their policy of insurance. The Court will sift through the evidence and reach its own conclusion.

Grange Mutual has established that at the time of the fire, due in large part to consequences flowing from her recent divorce from Mr. Caso, Ms. Guess was having financial difficulties. On the other hand, it appears that had Ms. Guess been able to sell the Willow Drive residence at a reasonable price, it would have substantially alleviated those difficulties. At the time of the fire, Ms. Guess had recently received an offer of $250,000.00 to purchase the residence. While she testified that she needed $285,000.00 to "come out" on the sale, the Court can only wonder whether the potential $35,000.00 difference could have induced Ms. Guess to embark on the obviously high risk endeavor, with all its attendant uncertainties, which Grange Mutual suggests.

While it is true that Ms. Guess was able to sell the lot on which the burned house had sat for $145,000.00 one month following the fire, there is no evidence in the record that Ms. Guess had access to a reliable appraisal of the potential sale price of the lot with a burned house on it. Moreover, while there is evidence in the record suggesting that Ms. Guess may have incorrectly assumed, before the fire, that the limits on the subject insurance casualty policy were greater than was actually the case, the Court is left to decide whether the hypothesis which the Defendant seeks to have it accept regarding Ms. Guess's financial calculations fall within the realm of reasonable inferences or of rank speculation. Inevitably, this requires the Court to assess the relative credibility of the two witnesses on whose testimony the Court finds this case turns - Ms. Guess and Mr. Hasselbring.

The critical issue, of course, is the alleged conversation, shortly before the fire, in which Mr. Hasselbring asserts that Ms. Guess asked Mr. Hasselbring if he knew of anyone who could help her burn her house, or words to that effect. Mr. Hasselbring strenuously insists the conversation took place as he describes it; Ms. Guess is equally adamant that it is a fabrication. Ms. Guess has gone to great lengths to suggest motivations that Mr. Hasselbring may have had to burn her house himself, and/or to perjure himself to implicate her for arson. All those suggested motivations relate, in one form or another, to a desire for revenge, or a desire to conceal his own guilt.

The Court observed the demeanor and listened to the words of both Ms. Guess and Mr. Hasselbring very carefully during their trial testimony. The Court noted that each witnesses' testimony seemed essentially consistent in material respects and remained largely unimpeached following aggressive cross-examination. Their respective demeanors appeared to the Court to be what would be expected given the obvious pressures they were under. The Court would concede that based on its observations, under other circumstances, it might conclude that each witnesses' testimony was credible. Obviously, that cannot be the case here.

In making its unavoidable determination regarding credibility, the Court is influenced by the fact that Ms. Guess and Mr. Hasselbring have both lived in the same relatively small community for a long period of time. They share many of the same friends and acquaintances. Given the profound implications that their contradictory testimonies are likely to have on their lives and the esteem in which they are held in their community, the Court is left to evaluate their testimony by considering who had the most to gain, and who had the most to lose, by giving false testimony at trial.

19

The legal and financial consequences are most obvious for Ms. Guess. They are somewhat less so for Mr. Hasselbring. Ms. Guess struck the Court as a composed and calm witness. She occasionally gave testimony contrary to her own self interest, thereby bolstering her credibility. The Court would observe, however, that any subterfuge or deception in which Ms. Guess may have engaged in this matter was set in motion more than three years ago. Once that course was embarked upon, it could be abandoned only at great risk to her self interest and well-being. The Court can conceive, without difficulty, of motivations that Ms. Guess might have had to give false testimony.

It is more difficult for the Court to conceive of why Mr. Hasselbring, on the other hand, would have exposed himself to the likely opprobrium of his community by giving false trial testimony. The Court thinks it highly unlikely that Mr. Hasselbring would have burned Ms. Guess's residence out of revenge for petty indignities, perceived or real, which he may have suffered at her hand.[2] At trial, Mr. Hasselbring struck the Court as a highly reluctant witness. That reluctance, in the Court's view, tends to enhance, rather than detract from, his credibility. The Court concludes that the agitation and impatience that Mr. Hasselbring displayed during his trial testimony was a symptom of his discomfort with the situation in which he found himself, not of a lack of veracity.

For the reasons expressed above, the Court is inclined to believe Mr. Hasselbring–and to disbelieve Ms. Guess–on the crucial issue of whether she made the disputed statement to Mr. Hasselbring regarding her intention to have her house burned. The Court therefore finds that she did, in fact, make it. This finding, in turn, leads the Court to find

---

[2] If for no other reason, Mr. Hasselbring would have had to realize that he would immediately become a prime suspect of any arson involving her house.

that Grange Mutual's hypothesis regarding Ms. Guess's financial motivation to burn her house is not only plausible but, in light of all the circumstances revealed by the evidence in the case, probable. Accordingly, the Court concludes that the Defendant has also carried its burden of proof with respect to this element of its affirmative defense of arson.

## V. CONCLUSION

For the foregoing reasons, the Court concludes that Defendant Grange Mutual has met its burden of proof as to the affirmative defense of arson. Accordingly, it is **ORDERED** that all claims brought in this action by Plaintiff Patricia Guess against Defendant Grange Mutual Casualty Company are hereby **DISMISSED WITH PREJUDICE**. Judgment will enter in favor of Defendant Grange Mutual. Once judgment has been entered, the Clerk of Court is **ORDERED** to **CLOSE** this case.

**SO ORDERED** this 28th day of September, 2007.

_____ _/s/Harry S. Mattice, Jr._____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE